UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE SCALIA,<br>United States Secretary of Labor,<br><br>            Plaintiff,<br><br>v.<br><br>RUANE, CUNNIFF & GOLDFARB, INC.;<br>DST SYSTEMS, INC.; ROBERT D. GOLDFARB;<br>THE ADVISORY COMMITTEE OF THE DST<br>SYSTEMS, INC. 401(K) PROFIT SHARING<br>PLAN; THE COMPENSATION COMMITTEE<br>OF THE BOARD OF DIRECTORS OF DST<br>SYSTEMS, INC.; KENNETH V. HAGER;<br>RANDALL D. YOUNG; GREGG W. GIVENS;<br>GERARD M. LAVIN; M. ELIZABETH<br>SWEETMAN; DOUGLAS W. TAPP; GEORGE L.<br>ARGYROS; LAWRENCE M. HIGBY; TRAVIS E.<br>REED; LOWELL L. BRYAN; SAMUEL G. LISS;<br>BRENT L. LAW; LYNN DORSEY BLEIL;<br>CHARLES E. HALDEMAN, JR.; JEROME H.<br>BAILEY; GARY D. FORSEE; and the DST<br>SYSTEMS, INC. 401(K) PROFIT SHARING<br>PLAN,<br><br>            Defendants. | Civil Action No. 1:19-cv-9302<br><br>**COMPLAINT FOR<br>ERISA VIOLATIONS**<br><br>(29 U.S.C. §§ 1001 et seq.) |

Plaintiff Eugene Scalia, Secretary of the United States Department of Labor (the "Secretary"), alleges as follows:

**PRELIMINARY STATEMENT**

1.   This action is filed under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq., against Ruane, Cunniff & Goldfarb, Inc. ("Ruane") and Robert D. Goldfarb (collectively the "Ruane Defendants"), and DST Systems, Inc. ("DST"), the Advisory Committee of the DST Systems, Inc. 401(K) Profit Sharing Plan ("DST Advisory Committee"), the Compensation Committee of the Board of Directors of DST Systems,

Inc. ("DST Compensation Committee"), six members of the DST Advisory Committee, and ten members of the DST Compensation Committee (all collectively the "DST Defendants") for violating their fiduciary duties under ERISA. At all relevant times, Defendants were fiduciaries of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Plan"). Contrary to their fiduciary duties of loyalty, prudence, diversification, and compliance with Plan documents, Defendants mismanaged Plan assets at all relevant times, resulting in significant losses to the Plan.

2.  The Plan had two components: a 401(k) plan and a profit sharing plan ("PSP"). The Plan's sponsor and Plan administrator, DST, appointed Ruane as investment manager for 100% of the PSP's assets. For decades, and at all relevant times, Ruane managed the investments of the PSP using its self-proclaimed investment strategy of "non-diversification." Rather than diversifying the PSP investments to minimize the risk of large losses to the participants' retirement savings, as required by ERISA, Ruane employed – and DST allowed Ruane to employ – its deliberate strategy of non-diversification to create an investment portfolio for the PSP that consisted solely of investments in two to three dozen individual stocks. Ruane generally refrained from rebalancing and instead held these investments long-term. As a result, the portfolio contained extremely high concentrations in certain individual stocks. For example, in 2010, Ruane had the PSP make a series of investments in a single equity that was allowed to grow to 45.4% of the total portfolio during the relevant period before any action was taken.

3.  By investing 100% of the PSP's assets using Ruane's non-diversification strategy, and failing to rebalance those investments, Defendants put participants' retirement savings at significant risk, in violation of their fiduciary duties of diversification, loyalty, and prudence under ERISA, and caused the Plan to suffer significant losses and lost opportunity costs. The DST

Defendants further violated ERISA by failing to appropriately monitor the Ruane Defendants and failing to follow the Plan document.

## JURISDICTION AND VENUE

4. This action is brought by the Secretary of Labor under ERISA §§ 409, 502(a)(2), and 502(a)(5), 29 U.S.C. §§ 1109, 1132(a)(2), and 1132(a)(5), to redress violations and enforce the provisions of Title I of ERISA.

5. This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6. Venue with respect to this action lies in the United States District Court for the Southern District of New York, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Ruane Defendants are located in New York, New York, within this district, and many of the violations at issue in this Complaint occurred within this district.

## PARTIES

7. Plaintiff the Secretary is vested with authority under ERISA §§ 502(a)(2) and (5) to enforce Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries who breach their duties under Title I of ERISA.

8. Defendant Ruane was an SEC-registered investment adviser from 1969 until 2018 with its principal place of business in New York, New York.[1] Ruane provides investment services to both individual and institutional clients, including 67 ERISA client accounts totaling over $4 billion in assets as of 2015. Ruane maintains both separately managed accounts and a registered investment company, the Sequoia Fund, Inc. (the "Sequoia Fund"). At all relevant times until July

---

[1] Effective March 31, 2018, Ruane terminated its SEC registration, and Ruane subsidiary and SEC-registered investment advisor Ruane, Cunniff & Goldfarb, LLP, began providing services to previous clients of its parent company.

31, 2016, Ruane was the investment manager to the PSP using a separately managed account.

9. Ruane had full investment power and control over the PSP's assets under its management. Ruane acknowledged in its agreement with DST that Ruane was a fiduciary regarding all assets in the portfolio it managed for the Plan. Thus, at all relevant times until July 31, 2016, Ruane was an ERISA § 3(38) investment manager and a fiduciary with respect to all Plan assets in the PSP portfolio it managed for the Plan. 29 U.S.C. § 1002(38); ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii). As a fiduciary, and as a person providing services to the Plan, Ruane was also a party in interest pursuant to ERISA §§ 3(14)(A) and (B), 29 U.S.C. §§ 1002(14)(A) and (B).

10. Defendant Robert D. Goldfarb was Chairman and Chief Executive Officer of Ruane at all relevant times until he retired on March 31, 2016. At all relevant times until March 31, 2016, Goldfarb was also the PSP's portfolio manager at Ruane. Goldfarb signed the 2010 investment management agreement with DST on behalf of Ruane. Goldfarb had final decision-making authority regarding investment selection and monitoring by Ruane for the PSP. Goldfarb was therefore a fiduciary to the Plan pursuant to ERISA §§ 3(21)(A)(i) and (iii) at all relevant times until March 31, 2016. As a fiduciary, and as a person providing services to the Plan, Goldfarb was also a party in interest pursuant to ERISA §§ 3(14)(A) and (B).

11. Defendant DST is a global outsourcing provider of technology-based information processing and servicing in the financial and healthcare industries. DST is a Delaware corporation with its headquarters in Kansas City, Missouri. At all relevant times, DST was the Plan Sponsor and Plan Administrator. DST exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the

administration of the Plan. DST was, therefore, at all relevant times, a fiduciary with respect to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii). As a fiduciary, Plan Administrator, and Plan Sponsor, DST was also, at all relevant times, a party in interest to the Plan pursuant to ERISA §§ 3(14)(A), (B) and (C), 29 U.S.C. §§ 1002(14)(A), (B) and (C).

12. The DST Advisory Committee was, at all relevant times, the named fiduciary for the Plan, as defined in ERISA § 402(a), 29 U.S.C. § 1102(a). The DST Advisory Committee consisted of three to ten members appointed by DST. All allegations herein regarding the DST Advisory Committee also apply to each individual member of that Committee. The DST Advisory Committee was responsible for monitoring Ruane as investment manager of the PSP. In these roles, the DST Advisory Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan. The DST Advisory Committee was, therefore, at all relevant times, a fiduciary with respect to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), as was each member of the DST Advisory Committee during his or her respective tenure on that committee. As named fiduciary, the DST Advisory Committee was also, at all relevant times, a party in interest to the Plan pursuant to ERISA § 3(14)(A), as was each member of the DST Advisory Committee.

13. The DST Compensation Committee was, at all relevant times, a committee of the DST Board of Directors who monitored the DST Advisory Committee and had the power to amend the Plan. All allegations herein regarding the DST Compensation Committee also apply to each individual member of that Committee. Until February 26, 2016, the DST Compensation Committee also appointed DST Advisory Committee members. In these roles, the DST

Compensation Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan. The DST Compensation Committee was, therefore, at all relevant times, a fiduciary with respect to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), as was each member of the DST Compensation Committee during his or her respective tenure on that committee. As a fiduciary, the DST Compensation Committee was also, at all relevant times, a party in interest to the Plan pursuant to ERISA § 3(14)(A), as was each individual member of the DST Compensation Committee.

14. Defendant Kenneth V. Hager was Chief Financial Officer for DST and, from 2011 to 2013, was a member of the DST Advisory Committee.

15. Defendant Randall D. Young was General Counsel and Secretary for DST and, from 2011 to 2016, was a member of the DST Advisory Committee.

16. Defendant Gregg W. Givens was Chief Financial Officer and Treasurer for DST and, from 2014 to 2016, was a member of the DST Advisory Committee.

17. Defendant Gerard M. Lavin was President and Chief Executive Officer of Westside Investment Management (a DST subsidiary) and, from 2013 to 2015, was a member of the DST Advisory Committee.

18. Defendant M. Elizabeth Sweetman was Chief Human Resource Officer of DST and, from 2013 to 2016, was a member of the DST Advisory Committee.

19. Defendant Douglas W. Tapp was Vice President of DST's Total Rewards program, a human resources division within DST, and, during 2015, was a member of the DST Advisory Committee.

20. Defendant George L. Argyros was a member of DST's Board of Directors and, from 2011 to 2013, was a member of the DST Compensation Committee.

21. Defendant Lawrence M. Higby was a member of DST's Board of Directors and, from 2011 to 2013, was a member of the DST Compensation Committee.

22. Defendant Travis E. Reed was a member of DST's Board of Directors and, from 2011 to 2014, was a member of the DST Compensation Committee.

23. Defendant Lowell L. Bryan was a member of DST's Board of Directors and, from 2012 to 2016, was a member of the DST Compensation Committee.

24. Defendant Samuel G. Liss was a member of DST's Board of Directors and, from 2012 to 2016, was a member of the DST Compensation Committee.

25. Defendant Brent L. Law was a member of DST's Board of Directors and, during 2013, was a member of the DST Compensation Committee.

26. Defendant Lynn Dorsey Bleil was a member of DST's Board of Directors and, from 2014 to 2016, was a member of the DST Compensation Committee.

27. Defendant Charles E. Haldeman, Jr., was a member of DST's Board of Directors and, from 2014 to 2016, was a member of the DST Compensation Committee.

28. Defendant Jerome H. Bailey was a member of DST's Board of Directors and, from 2015 to 2016, was a member of the DST Compensation Committee.

29. Defendant Gary D. Forsee was a member of DST's Board of Directors and, from, 2015 to 2016, was a member of the DST Compensation Committee.

30. The Plan is an employee benefit plan as defined by ERISA § 3(3), 29 U.S.C. § 1002(3), and is subject to coverage under ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1). The Plan is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of

Civil Procedure solely to assure that the Court can accord complete relief. Collective references to "Defendants" do not include the Plan unless otherwise indicated.

## GENERAL ALLEGATIONS

### The Plan

31. The Plan is a defined contribution plan that was formed when two separate plans, the DST Systems, Inc. Profit Sharing Plan ("PSP") and the DST Systems, Inc. 401(k) Plan, merged effective January 1, 2000. The resultant Plan consisted of the PSP and a 401(k) portion until January 1, 2017. Each portion of the Plan comprised roughly 50% of total Plan assets as of December 2014. The Plan had 10,405 participants and $1,405,662,698 in total assets as of December 31, 2017.

### DST Caused the PSP to Be Invested with Ruane in a High Risk, Non-Diversified Manner

32. Soon after the PSP was established in the 1970s, DST appointed Ruane to serve as the PSP's investment manager. Ruane managed the PSP assets through a separately managed account; the PSP's account was not part of the Sequoia Fund. Ruane continued as the investment manager for the PSP portion of the Plan until July 31, 2016. DST retained Ruane as the PSP's investment manager and expressly authorized Ruane to implement its non-diversification strategy for 100% of the PSP's assets for the entirety of that period. Ruane knew, or should have known, that it was managing 100% of the PSP's assets and willingly applied its non-diversification strategy to those assets for the entirety of that period.

33. On July 31, 2016, DST terminated its contract with Ruane and transitioned Ruane's investment responsibilities to a different investment manager. In August 2016, the PSP's new investment manager sold the PSP investments previously managed by Ruane and replaced them with shares of an exchange-traded fund. Since January 1, 2017, the Plan no longer has a profit

sharing portion; all Plan assets are in the Plan's 401(k) accounts for which participants select the investments.

### The Ruane Defendants' Failure to Diversify the PSP's Investments

34. Ruane was explicit with all of its clients, including DST, that it had an investment strategy of non-diversification. Ruane's strategy was to invest on a very concentrated basis in a select number of securities with a long-term time horizon. If a prospective client had another investment objective, Ruane advised that they not retain Ruane's services.

35. At all relevant times, Ruane had the same investment goal for all of its clients: "to provide a return superior to that of the S&P 500 by a margin as wide as possible . . . subject to risk." Ruane's Forms ADV, Part 2 that it filed with the U.S. Securities and Exchange Commission stated that its investment strategies included "Focused Portfolio/Non-diversification," meaning that Ruane "focuses its investments on a limited number of issuers and does not seek to diversify investments among types of securities, countries or industry sectors" and that, "[a]ccordingly, client portfolios are subject to more rapid change in value than would be the case if [Ruane] were to maintain a wider diversification among types of securities and other instruments, countries or industry sectors."

36. Ruane used the same focused investment strategy for all of its clients, both ERISA and non-ERISA, and regardless of what percentage of a client's assets it managed. Ruane also invested in the same securities for all of its clients. In fact, because separately managed accounts were free of certain restrictions regarding concentration that applied to the Sequoia Fund, the separately managed accounts' investments (like the PSP's) were, at times, even more concentrated than the Sequoia Fund.

37. Ruane's investment strategy was evident in the monthly portfolio status reports it provided to DST summarizing the PSP's holdings. These statements showed that the PSP consistently maintained heavily concentrated positions in a number of individual stocks.

**The Ruane Defendants' Investment Strategy and Its Inherent Risk of Large Losses Were Exemplified by the Over-Concentration in Valeant Stock**

38. The most striking example of Ruane's failure to diversify was the PSP's concentrated holdings in Valeant Pharmaceuticals International, Inc. ("Valeant"), a Canadian pharmaceutical company. Ruane was, through its clients including the PSP, the largest shareholder of Valeant from approximately December 2014 until March 2016, holding about 10% of total outstanding Valeant shares.

39. In a series of transactions that stretched from April to November 2010, Ruane invested the PSP aggressively in Valeant. By the end of 2010, the PSP's investment in Valeant already constituted 9.4% of the PSP's total assets. Rather than rebalancing, Ruane maintained the PSP's Valeant positions even as the stock became a still greater part of the PSP during the relevant period. The concentration in Valeant stock reached 27.7% of the PSP's assets (having a market value of $206,289,280) by May 2014 and 45.4% of the PSP's assets (having a market value of $404,890,469) by July 2015. The value of those Valeant shares then dropped dramatically later in 2015 and into 2016.

40. On August 28, 2015, in response to instructions by DST to reduce any holdings in a single security to no more than 25% of the PSP's assets, Ruane sold 4,200 of the PSP's 1,572,207 shares of Valeant at approximately $236.03 per share. On September 16, 2015, Ruane sold an additional 5,000 Valeant shares at approximately $233.40 per share, and then 10,000 shares on September 17, 2015, at approximately $239.10 per share. However, as of September 30, 2015, even after the sale of those 19,200 shares (or 1.22% of the PSP's Valeant holdings), the PSP still

held 1,553,007 Valeant shares (having a market value of $277,025,389), making up 37.7% of the PSP's total assets.

41.     Between September 17, 2015, and October 31, 2015, the Valeant share price dropped from $239.10 to $93.77. As of October 31, 2015, the percentage of the PSP's total assets made up by its Valeant holdings was 23.2%, down from 37.7% at the end of September, purely due to depreciation in the share price.

42.     Ruane sold no additional Valeant shares for the PSP until April 5, 2016, at which point Ruane initiated a structured sale to eliminate all Valeant shares from the portfolios of all of its clients, including the PSP. Between April 5, 2016, and June 17, 2016, Ruane sold the PSP's remaining Valeant shares at prices ranging from $22.35 to $36.75 per share.

43.     Ruane's belated attempt to rebalance – and DST's belated attempt to demand rebalancing – was too little too late. The total amount the PSP received from Ruane's sale of its Valeant shares (which were sold entirely between August 28, 2015 and June 17, 2016) was just $46,335,761.36, more than $359 million (or 88%) less than the shares' peak value.

### The DST Defendants' Failure to Monitor Ruane

44.     One of the Advisory Committee's duties as the Plan's named fiduciary was to monitor Ruane as the PSP's investment manager. Minutes of the DST Advisory Committee show minimal discussion regarding the PSP until May 2014, however. Prior to that date, the DST Advisory Committee failed to discuss the prudence of retaining Ruane as the investment manager for the PSP or the Plan's steadily increasing exposure to Valeant. Once they began discussions of these issues, the DST Advisory Committee still failed to exercise real oversight.

45.     For example, at the August 12, 2014 meeting of the DST Advisory Committee, Defendant Lavin provided the Committee with a memorandum dated June 19, 2014, regarding his

June 4, 2014 meeting with Defendant Goldfarb. That memo explained that, as of June 2014, Valeant represented 27% of the PSP's portfolio.

46. During the next DST Advisory Committee meeting, on November 21, 2014, the Committee discussed the PSP's high concentration in three single equities, each of which constituted more than 9% of the PSP's assets, including Valeant, which then amounted to 28.6% of the PSP's assets. Still, the DST Advisory Committee noted its "strong level of confidence in Ruane's ability to prudently manage the fund" and failed to take any action to reduce those concentrations. When the DST Advisory Committee met next on December 12, 2014, it did not discuss the PSP. In fact, the DST Advisory Committee did not discuss the PSP's holdings again until June 9, 2015, at which point Valeant represented 43% of the PSP's portfolio.

47. At around that time, the DST Compensation Committee asked the DST Advisory Committee whether it had considered new investment managers for the PSP, and advised the DST Advisory Committee of its desire "that consideration be given to approaches to diversification." Prior to that time, the Compensation Committee's minutes show no discussion of the PSP.

48. The DST Advisory Committee met on August 13, 2015, and discussed the nearly 45% of PSP assets that were then invested in Valeant because of its share price increasing "almost 72% since the beginning of the year." The DST Advisory Committee agreed that it would put into place "certain concentration caps" but leave Ruane with "sole discretion as to how to manage and invest" the PSP.

49. On August 28, 2015, the DST Advisory Committee instructed Ruane via letter to implement a "concentration cap" that would limit any investment in a single security to no more than 25% of the PSP's portfolio. However, Ruane was left with "the discretion and time to determine the most prudent manner in which to decrease the concentration of such investment."

On November 11, 2015, Ruane executed a revised Schedule A to its 1998 Investment Management Agreement with DST that memorialized the concentration limit detailed in the DST Advisory Committee's August 28, 2015 letter.

50. On November 6, 2015, the DST Advisory Committee met and decided that Defendant Lavin should contact Ruane to better understand Ruane's analysis of the situation, Ruane's investment strategy going forward, and how Ruane would manage the new diversification instruction from the Committee "in light of the rapid recent decline in Valeant's stock price." On November 20, 2015, the DST Advisory Committee met again. At that meeting, Defendant Lavin reported that Goldfarb had explained to him that Ruane continued to believe that Valeant was under-valued, and therefore Ruane did not plan to change its investment strategy. The DST Advisory Committee also noted that several members of the Sequoia Fund's board had recently resigned because the Sequoia Fund had been making additional investments in Valeant shares, an approach with which the departing members did not agree.

51. Nonetheless, the DST Advisory Committee "concluded that Mr. Lavin had received appropriate and satisfactory answers from Mr. Goldfarb concerning Ruane's . . . Valeant investment," and took no further action. The DST Advisory Committee did not demand additional diversification of the PSP, and none was effected prior to April 5, 2016, at which point Ruane initiated a structured sale to eliminate all Valeant shares from the portfolios of all of its clients, including the PSP. The minimal "oversight" of Ruane by the DST Advisory Committee, which included only a single attempt to improve the PSP's level of diversification through a 25% concentration cap in August 2015, was far too little, too late.

52. Notably, the DST Advisory Committee's monitoring of the Plan's PSP investments was significantly less active than its monitoring of the Plan's 401(k) investments. Throughout the

relevant period, the DST Advisory Committee extensively discussed the investment options, overall asset allocation, and diversification in the 401(k) portion of the Plan. Also throughout the relevant period, a relationship manager and a portfolio manager from the trustee to the 401(k) portion of the Plan attended most DST Advisory Committee meetings to discuss the investments offered as part of the 401(k) program.

53. Going back at least to 2009, the DST Advisory Committee developed and approved a detailed written investment policy statement for the 401(k) portion of the Plan. During the relevant period, the DST Advisory Committee routinely discussed each 401(k) investment option and whether it met the criteria of the investment policy statement, placing those that did not on a "watch list" and ultimately removing them as investment options as deemed necessary. The marked contrast between the DST Defendants' oversight of the 401(k) portion of the Plan and their far less stringent oversight of the PSP underscores their failure to appropriately monitor the PSP.

**The DST Defendants' Failure to Establish a Written Investment Policy for the PSP**

54. The Plan document required that the DST Advisory Committee establish "a written investment policy" for the Plan in conformity with ERISA. The DST Advisory Committee, however, failed to develop a written investment policy statement for the PSP portion of the Plan. In fact, not until 2015 did the DST Advisory Committee provide any investment instructions to Ruane specific to the interests of the Plan. Neither DST nor the DST Compensation Committee, responsible for monitoring the DST Advisory Committee, took any steps to remedy the DST Advisory Committee's failure to act in accordance with the Plan document.

55. In contrast, the DST Advisory Committee created a written investment policy statement for the 401(k) portion of the Plan with directions for ongoing monitoring. The policy statement set forth the investment objective of "offer[ing] a broad range of investment alternatives

with materially different risk and return to enable participants, by choosing among such alternatives, to achieve a portfolio with aggregate risk and return characteristics within a range normally appropriate for each Participant, and to minimize through diversification the overall risk of such individual's portfolio." No such policy was in place for the PSP portion of the Plan under Ruane's investment control. Therefore, no limitations were placed on Ruane's non-diversification.

## FIRST CLAIM FOR RELIEF
**(Against the Ruane Defendants for Violation of Their Fiduciary Duties of Loyalty, Prudence, and to Diversify the Assets of the PSP)**

56. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the allegations of paragraphs 1 through 55 inclusive.

57. The Ruane Defendants failed to protect the Plan and its participants and beneficiaries' interests by, among other things, implementing an investment strategy for 100% of the PSP's assets that:

    a.    expressly followed a "Focused Portfolio/Non-diversification" investment policy;

    b.    expressly "focuse[d] its investments on a limited number of issuers and d[id] not seek to diversify investments among types of securities, countries or industry sectors";

    c.    expressly stated "client portfolios are subject to more rapid change in value than would be the case if [Ruane] were to maintain a wider diversification among types of securities and other instruments, countries or industry sectors";

    d.    used the same focused investment strategy for all of its clients, both ERISA and non-ERISA, regardless of what percentage of a client's assets it managed; and

  e. failed to rebalance the PSP's assets, allowing, for example, Valeant stock to constitute 27.2% of the PSP's total assets as of May 2014 and 45.4% of the PSP's total assets as of July 31, 2015.

58. By the conduct set forth herein, the Ruane Defendants:

  a. failed to discharge their duties to the Plan solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

  b. failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and

  c. failed to diversify the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, in violation of ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

59. As a direct and proximate result of the conduct described above, the Ruane Defendants caused the Plan and its participants to suffer harm for which the Ruane Defendants are jointly and severally liable and for which the Plan and its participants are entitled to monetary and appropriate injunctive or other equitable relief pursuant to ERISA §§ 409(a), 502(a)(2), and 502(a)(5).

**SECOND CLAIM FOR RELIEF**
**(Against the DST Defendants for Violation of Their Fiduciary Duties of Loyalty, Prudence, and to Diversify the Assets of the PSP, Failing to Monitor the Ruane Defendants, and Failing to Establish a Written Investment Policy)**

60. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the allegations of paragraphs 1 through 59 inclusive.

61. The DST Defendants failed to protect the Plan and its participants' and beneficiaries' interests by, among other things:

 a. retaining Ruane and expressly authorizing Ruane to implement an investment strategy of non-diversification for 100% of the PSP;

 b. failing to appropriately monitor the Ruane Defendants and to take appropriate action to diversify the PSP's assets to minimize the risk of losses;

 c. authorizing Ruane in August 2015 to hold as much as 25% of the PSP's total assets in the stock of any one company;

 d. waiting until August 2015, after the PSP's Valeant holdings already comprised 45.4% of its total assets, before making any attempt to diversify the PSP portfolio with respect to the Valeant holdings; and

 e. failing to establish "a written investment policy" for the PSP as required by the Plan document.

62. By the conduct set forth herein, the DST Defendants:

 a. failed to discharge their duties to the Plan solely in the interest of the participants and beneficiaries of the Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A);

  b. failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B);

  c. failed to diversify the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, in violation of ERISA § 404(a)(1)(C); and

  d. failed to act in accordance with the documents and instruments governing the Plan, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

63. As a direct and proximate result of the conduct described above, the DST Defendants caused the Plan and its participants to suffer harm for which the DST Defendants are jointly and severally liable and for which the Plan and its participants are entitled to monetary and appropriate injunctive or other equitable relief pursuant to ERISA §§ 409(a), 502(a)(2), and 502(a)(5).

## THIRD CLAIM FOR RELIEF
### (Against the DST Defendants for Co-Fiduciary Liability for the Ruane Defendants' Breaches)

64. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the allegations of paragraphs 1 through 63 inclusive.

65. The DST Defendants failed to protect the Plan and its participants' and beneficiaries' interests by, among other things:

  a. knowingly participating in Ruane's investment of the entirety of the PSP's assets using an explicit non-diversification investment strategy;

   b. enabling the Ruane Defendants' breaches through their inattention to Ruane's investment decisions and the performance of the PSP's portfolio (in stark contrast to the attention they gave to the 401(k) portion of the Plan's investments); and

   c. failing to take appropriate action to protect the Plan from losses upon discovery that Ruane was not fulfilling its own duties to diversify Plan assets.

  66. By the conduct set forth herein, the DST Defendants:

   a. knowingly participated in the Ruane Defendants' fiduciary breaches;

   b. failed to comply with their own fiduciary duties under ERISA § 404(a)(1), thereby enabling their the Ruane Defendants' to commit the breaches alleged herein; and

   c. had knowledge of the Ruane Defendants' fiduciary breaches but failed to make reasonable efforts under the circumstances to remedy the breaches.

  67. Accordingly, under ERISA § 405, 29 U.S.C. § 1105, the DST Defendants are jointly and severally liable for the Ruane Defendants' breaches alleged in the First Claim for Relief, and the Plan and its participants are entitled to monetary and appropriate injunctive or other equitable relief pursuant to ERISA §§ 409(a), 502(a)(2), and 502(a)(5).

### **PRAYER FOR RELIEF**

  WHEREFORE, the Secretary prays that this Court enter an Order:

  1. requiring Defendants jointly and severally to restore to the Plan and its participants all losses caused, and to disgorge and restore all profits received, as a result of Defendants' fiduciary breaches, plus interest;

  2. granting appropriate injunctive and other equitable relief to redress the ERISA violations, to enforce ERISA, and to prevent future ERISA violations; and

  3. granting such other relief as may be equitable, just, and proper.

Dated: October 8, 2019
New York, New York

Respectfully submitted,

For the Secretary:

KATE S. O'SCANNLAIN
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor
Plan Benefits Security Division

JEFFREY S. ROGOFF
Regional Solicitor
New York Regional Solicitor's Office

GLENN M. LOOS
Counsel for Litigation
Plan Benefits Security Division

MICHAEL R. HARTMAN
ERISA Counsel
New York Regional Solicitor's Office

ANNA O. AREA
Senior Trial Attorney
Plan Benefits Security Division

_____
ORLY S. GODFREY
Attorney
Office of the Solicitor
201 Varick Street
Room 983
New York, New York 10014
Telephone: (646) 264-3650
Facsimile: (646) 264-3660

ISIDRO MARISCAL
Trial Attorney
Plan Benefits Security Division
Office of the Solicitor
P.O. Box 1914
Washington, DC 20013
Telephone: (202) 693-5600
Facsimile: (202) 693-5610